IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| IN RE: PETER CHURCHILL LABOVITZ, ) | |
| ) | Bankr. No. 24-11337 |
| Debtor. ) | Adv. Proc. No. _____ |
| _____ ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| PETER C. LABOVITZ, ) | |
| 510 Wolfe Street ) | |
| Alexandria, VA 22314; ) | |
| ) | |
| SHARON M. LABOVITZ, individually and ) | |
| as Trustee for Sharon McGee Labovitz Trusts 1 ) | |
| and 2, ) | |
| 510 Wolfe Street ) | |
| Alexandria, VA 22314; ) | |
| ) | |
| DCI PUBLISHING OF ALEXANDRIA, INC., ) | |
| 510 Wolfe Street ) | |
| Alexandria, VA 22314; ) | |
| ) | |
| SHARON MCGEE LABOVITZ TRUST 1, ) | |
| through its trustee, Sharon McGee Labovitz; ) | |
| ) | |
| SHARON MCGEE LABOVITZ TRUST 2, ) | |
| through its trustee, Sharon McGee Labovitz; ) | |
| ) | |
| TARA LLOYD, as Plan Agent for the Labovitz ) | |
| Collateral Pool, ) | |
| 510 Wolfe Street ) | |
| Alexandria, VA 22314 ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

1

**COMPLAINT TO DETERMINE THE EXTENT AND VALIDITY OF LIENS**

Plaintiff, the United States of America, at the request of the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and at the direction of the Attorney General of the United States, brings this action to determine the validity, priority, and extent of all liens and other interests in the real property located at 510 Wolfe Street, Alexandria, VA 22314, and also brings this action to object to three claims and debts underlying those liens, pursuant to Federal Rules of Bankruptcy Procedure 7001(b) and 3007(b).

**INITIAL BACKGROUND INFORMATION**

1. Counts 1-3 in this adversary proceeding mirror three counts brought in the District Court case of *United States v. Peter Labovitz*, case 1:23-cv-00924-MSN-LRV (E.D. Va.) (the "District Court case"). The District Court case sought a declaratory judgment that the liens at issue in this adversary proceeding were void.

2. Debtor Peter Labovitz filed his bankruptcy petition at 1:48 p.m. on July 24, 2024, less than 24 hours before the scheduled final pretrial conference in the District Court case. Final pretrial disclosures were due the next morning, and the parties were finalizing their joint stipulations at the time the petition was filed.

3. Debtor identified the District Court case in his disclosure statement, and he included a copy of the United States' first amended complaint and Peter Labovitz's answer. (Bankr. Dkt. 64).

**JURISDICTION & VENUE**

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a), 157(b)(2)(K), and 1345; 26 U.S.C. §§ 7402 and 7403.

2

5. The Bankruptcy Court has jurisdiction pursuant to Federal Rule of Bankruptcy Procedure 7008. The dispute arises under Title 11 of the United States Code, the dispute is 'related to' the debtor's bankruptcy case, and the United States submits to this Court's jurisdiction to adjudicate the matter.

6. Venue is proper in this Court by virtue of 28 U.S.C. §§ 1408 and 1409(a) because Peter Labovitz resides at 510 Wolfe Street, Alexandria, Virginia 22314, in this judicial district; and further because the main bankruptcy case (Bankr. No. 24-11337) to which this adversary proceeding relates was commenced in this district.

**PARTIES**

7. Plaintiff is the United States of America.

8. Defendant is Peter C. Labovitz ("Labovitz"), residing at 510 Wolfe Street, Alexandria, Virginia,

9. Sharon Labovitz is the wife of Peter C. Labovitz. She is joined as a defendant both in an individual capacity and as a trustee of the Sharon McGee Labovitz Trust 1 and Sharon McGee Labovitz Trust 2 ("the Trusts"), because in both capacities she may claim an interest in the property at issue in this action. She resides at 510 Wolfe Street, Alexandria, Virginia.

10. DCI Publishing of Alexandria, Inc. ("DCIA") is joined as a defendant because it may claim an interest in the property at issue in this action. DCIA is a corporation organized under Delaware law with its principal place of business at 510 Wolfe Street, Alexandria, Virginia.

11. Sharon McGee Labovitz Trust 1 is joined as a defendant because it may claim an interest in the property at issue in this action. The Sharon McGee Labovitz Trust 1 is located at 510 Wolfe Street, Alexandria, Virginia.

12. Sharon McGee Labovitz Trust 2 is joined as a defendant because it may claim an interest in the property at issue in this action. The Sharon McGee Labovitz Trust 2 is located at 510 Wolfe Street, Alexandria, Virginia.

13. Tara Lloyd is the daughter of Peter Labovitz and is joined as a defendant in her capacity as "Plan Agent for the Labovitz Collateral Pool," because she may, in that capacity, claim an interest in the property at issue in this action. Upon information and belief, Tara Lloyd resides at 510 Wolfe Street, Alexandria, Virginia.

## BACKGROUND FACTS

*Nature of This Action*

14. Peter Labovitz owes the United States over $3 million in unpaid federal tax liabilities and statutory accruals. This Court entered a judgment in favor of the United States and against Peter C. Labovitz on June 11, 2013, in *United States v. Labovitz*, civil no. 1:12-cv-106. Mr. Labovitz consented to entry of the judgment.

15. To prevent the United States from foreclosing on his property interests to satisfy the tax liabilities underlying the judgment, Labovitz has orchestrated a series of fraudulent conveyances and nominee transactions to obstruct, hinder, and delay the collection of his tax liabilities.

16. In 1987, Peter Labovitz established and funded the Trusts purportedly on Sharon Labovitz's behalf. Sharon Labovitz is the trustee of both Trusts. Sharon Labovitz is also the sole beneficiary of the Trusts until her death, at which point the property of the Trusts gets distributed to her children or others she has designated by will.

17. Labovitz has transferred almost all of his property interests to the Trusts, or to other business entities now owned by the Trusts. These transfers were either: (1) made for little

4

or no consideration, or (2) in exchange for promissory notes or other security interests that Labovitz alleges are worthless, and which have never been paid back. The transfers give Labovitz the appearance that he has no valuable assets.

*Labovitz's Residence: 510 Wolfe Street*

18. The residence that Peter and Sharon Labovitz own, located at 510 Wolfe Street, Alexandria, Virginia is more specifically described as:

> Lot 501 of the Subdivision of ZERELDA C. McCONNELL, as the said Subdivision appears duly dedicated, platted and recorded among the land records of the City of Alexandria, Virginia, on the 31st day of October, 1966, in Deed Book 658, Page 556.

hereinafter referred to as ("the Residence").

19. Peter Labovitz and Sharon Labovitz purport that the Residence is encumbered by three security interests that have priority over the IRS's tax liens and judgment lien. The alleged encumbrances are described in more detail below, but are referred to as the "Collateral Pool Lien," the "Access Bank Note," and the "NVR Note."

20. To summarize, however, the Collateral Pool Lien, the Access Bank Note, and the NVR Note are all invalid.

21. The Collateral Pool Lien, the Access Bank Note, and the NVR Note are each held either directly or indirectly by the Trusts. The Trusts and their derivative entities have not acted like creditors holding liens against Labovitz. Labovitz has made nominal payments – or no payments at all – on the supposed "debts" that underlie the liens. In addition, two of the liens have lapsed by the passage of time. Moreover, one of the liens tracks a supposedly growing debt, but this debt was satisfied back in 2006 by paying the lenders using the proceeds from selling some property that served as collateral to the loan.

5

22. Despite this, Labovitz claims that the "debts" underlying the three alleged encumbrances on the Residence continue to exist and continue to grow at the interest rates set out in the original debt instruments.

23. Labovitz uses his residence as he wishes, while maintaining that (1) he has no assets or income with which to pay his federal tax liabilities; and that (2) his house is fully encumbered by ever-growing debts that will consume all equity in the property in perpetuity.

24. The actions set out in the above paragraphs were taken to avoid payment of Labovitz's tax debts.

*Labovitz's Unpaid Tax Liabilities*

25. The Internal Revenue Service (IRS) assessed civil penalties under 26 U.S.C. § 6672 (Section 6672) against Peter Labovitz corresponding to unpaid federal employment taxes withheld from the wages of the employees of DCI Publishing, Inc. and/or Connection Publishing, Inc. for the taxable periods ending March 31, 1998; March 31, 2000; September 30, 2000; and December 31, 2000. These taxes withheld from employee wages are held by employers as "a special fund in trust for the United States" under 26 U.S.C. § 7501(a), so they are commonly referred to as "trust fund" taxes.

26. Peter Labovitz was the President of both DCI Publishing, Inc.[1] and Connection Publishing, Inc., during the taxable periods identified above.

27. On August 9, 1999, the IRS assessed Section 6672 penalties against Labovitz for the taxable period ending March 31, 1998.

---

[1] DCI Publishing, Inc. is a different entity from DCI Publishing of Alexandria, Inc., though both were newspaper management companies. The latter entity is what is referred to as "DCIA" throughout this Complaint. The former is always referred to by its full name, DCI Publishing, Inc.

6

28. On November 13, 2000, the IRS assessed Section 6672 penalties against Labovitz for the taxable period ending March 31, 2000.

29. On August 12, 2002, the IRS assessed Section 6672 penalties against Labovitz for the taxable period ending September 30, 2000.

30. On August 12, 2002, the IRS assessed Section 6672 penalties against Labovitz for the taxable period ending December 31, 2000.

31. By reason of the assessments described in paragraphs 27-30, federal tax liens arose on the dates of those assessments pursuant to 26 U.S.C. §§ 6321 and 6322 and attach to all property and rights to property owned or thereafter acquired by Labovitz.

32. The IRS filed and re-filed notices of the federal tax liens corresponding to the assessments described in paragraphs 27-30.

33. The notices of the federal tax liens were originally filed on September 25, 2002.

34. The re-filing deadline for two of the notices of the federal tax liens expired in error. The IRS filed "revocation of releases" concerning these liens and then re-filed notices of federal tax liens for the assessments in paragraphs 27 and 28 in August 2011.

35. The IRS re-filed notices of the federal tax liens corresponding to the assessments described in paragraphs 29 and 30 in June 2012.

36. Related to the assessments described in paragraphs 27 - 30, the United States District Court for the Eastern District of Virginia, in civil action no. 1:12-cv-106, entered judgment on June 11, 2013, in favor of the United States and against Peter Labovitz for $2 million for unpaid trust fund taxes withheld from the wages of the employees of DCI Publishing, Inc. and/or Connection Publishing Inc. for the taxable periods ending March 31, 1998; March 31,

2000; September 30, 2000; and December 31, 2000. With statutory accruals, the amount owed on the judgment is $3,002,891 as of June 30, 2023.

37. The United States' abstract of judgment against Labovitz in Case No. 1:12-cv-106 was recorded in the Alexandria land records on June 30, 2016.

38. No payments have been made to satisfy the judgment or the underlying tax assessments described in the paragraphs above.

**COUNT I: DECLARATORY JUDGMENT THAT THE COLLATERAL POOL LIEN AGAINST LABOVITZ'S RESIDENCE IS NO LONGER ENFORCEABLE BECAUSE IT HAS BEEN SATISFIED IN FULL, OR IN THE ALTERNATIVE, BECAUSE THE LIMITATIONS PERIOD FOR ENFORCING IT HAS EXPIRED UNDER VIRGINIA CODE § 8.01-242**

39. The allegations contained in paragraphs 1– 38 are restated as if fully set forth herein.

40. In the early 1990s, Peter Labovitz borrowed funds from friends and family (the "Original Lenders"). Labovitz executed multiple promissory notes to memorialize the loans (the "Promissory Notes").

41. In order to collateralize the Promissory Notes, Labovitz entered a Collateral Pool Agreement, effective May 20, 1992, with the various note holders. Under the Collateral Pool Agreement, Labovitz was to grant a security interest in favor of the Original Lenders against specified property of the Labovitzes that was to serve as collateral for the debts owed under the Promissory Notes. This security interest shall be referred to in this complaint as the Collateral Pool Lien.

42. Under the Collateral Pool Agreement, the Collateral Pool Lien was to encumber the Residence. To place this encumbrance on the Residence, Labovitz executed a Deed of Trust on December 24, 1992, and recorded it in land records on October 26, 1993.

43. The collateral subject to the Collateral Pool Lien also included a 12.28% Class B Interest in Gadsby Lodging Associates, LLC. Peter Labovitz owned the 12.28% Class B Interest in Gadsby Lodging Associates, LLC. At the time, Gadsby Lodging Associates, LLC owned the Old Town Alexandria Holiday Inn Select, located at 480 King Street, Alexandria, VA 22314.

44. The Class B interest in Gadsby Lodging Associates, LLC was transferred from Labovitz to the Trusts in February 1998, and then transferred from the Trusts to DCIA in December 2000. Each transfer of the collateral underlying the Collateral Pool Lien, including the interest in Gadsby Lodging Associates, LLC, was made subject to the Collateral Pool Lien.

45. The Collateral Pool Agreement required that if any of the underlying collateral was sold, the Original Lenders would be paid first from the sale proceeds.

46. The Collateral Pool Agreement also stated that the obligations under it would terminate on December 31, 2010, if each of the Original Lenders' loans had been repaid in full.

47. The Old Town Alexandria Holiday Inn located at 480 King Street was later sold on January 26, 2006. Gatsby Lodging Associates, L.L.C. received approximately $55 million from the sale. DCIA was paid approximately $6.4 million from the sale of the Holiday Inn, which corresponded to the 12.28% Class B Shares that had been transferred to DCIA in December 2000.

48. In separate transactions in 2006, some of the approximately $6.4 million in proceeds from the sale of the Holiday Inn were used to pay the Original Lenders the amounts they were owed under the Promissory Notes and the Collateral Pool Agreement.

49. Paying the Original Lenders in full, from the proceeds of collateral that is specifically listed in the Collateral Pool Agreement, and pursuant to the terms of the Collateral Pool Agreement, is the definition of satisfying the debts underlying the Collateral Pool Lien.

50. Despite the Original Lenders being paid in full, Peter Labovitz did not mark the debt satisfied. Instead, he fraudulently purported that DCIA "bought" the Collateral Pool debt from the Original Lenders. But DCIA didn't use its own money to allegedly "buy" the Collateral Pool debt. It used the $6.4 million Holiday Inn payment that was required to go to the Original Lenders as payment.

51. Consequently, the beneficial interests in the Collateral Pool lien were not "bought" by DCIA. Rather, the Promissory Notes were paid in full, and the Collateral Pool Lien was terminated.

52. The true nature of the Collateral Pool lien – that it has been paid off in full – is evident from DCIA's own tax returns. DCIA did not list its fraudulent "beneficial interests" in the Collateral Pool Lien on its 2006 through 2010 tax returns, despite being required to do so if it were a valid asset. Instead, DCIA listed the Collateral Pool lien for the first time as an asset of DCIA on DCIA's 2011 tax return, which was filed *after* the Government brought suit no. 12-cv-106 (E.D. Va.) on February 1, 2012, seeking collection of $2.5 million in trust fund penalties that Peter Labovitz owed, and the government issued discovery about Labovitz's financial dealings.

53. Even then, for 2011, the Collateral Pool Lien was ascribed no value as an asset of DCIA. The Collateral Pool Lien was first described as valuable when it was given an estimated value of over $3 million on DCIA's 2012 tax return.

54. In 2022, for the first time, DCIA sought to foreclose on the fraudulent Collateral Pool Lien, by seeking to foreclose on Peter and Sharon Labovitz's residence. DCIA scheduled a nonjudicial foreclosure sale on this lien for February 11, 2022. The foreclosure action was later withdrawn when it became apparent that the statute of limitations on the Collateral Pool Lien had expired on February 1, 2022.

55. The Court should declare that the Promissory Notes have been paid in full and have no force and effect; and further that the Collateral Pool Lien on the Residence is terminated as well.

*Alternatively, the Collateral Pool Lien is Unenforceable against the Residence under Virginia Code § 8.01-242*

56. Alternatively, the Collateral Pool Lien should be declared unenforceable as against the Residence under Virginia law.

57. To encumber the Residence with the Collateral Pool Agreement, Labovitz executed and recorded a deed of trust in the land records.

58. Pursuant to Virginia Code § 8.01-242, if the parties to a deed of trust omit the maturity date from the deed of trust itself, the deed of trust is only enforceable for 20 years. The limitations period may be extended once for an additional period of 10 years if the beneficial owner of the property files a certificate of extension.

59. The Deed of Trust for the Collateral Pool Lien did not list a maturity date.

60. The Deed of Trust for the Collateral Pool Lien was executed on December 24, 1992, and extended once with a certificate of extension that was filed on February 1, 2012.

61. Thus, the limitations period on collection for the Collateral Pool Lien expired on February 1, 2022.

62. DCIA never demanded payment of either interest or principal on the Collateral Pool Lien until January 2022, when DCIA noticed a nonjudicial foreclosure action set for early 2022.

63. DCIA later withdrew the nonjudicial foreclosure action, when it realized that would not be able to execute the foreclosure sale before the statute of limitations on enforcement of the lien expired.

11

64. Consequently, this Court should declare that the Collateral Pool Lien is unenforceable as to the Residence under Virginia Law because the limitations period for enforcing the associated Deed of Trust against the Residence has expired.

**COUNT II: DECLARATORY JUDGMENT THAT THE ACCESS BANK NOTE IS NO LONGER ENFORCEABLE BECAUSE THE TIME TO ENFORCE IT HAS EXPIRED UNDER VIRGINIA CODE § 8.01-241, OR, IN THE ALTERNATIVE, BECAUSE THE NOTEHOLDER, DCIA, IS THE NOMINEE OF PETER LABOVITZ, OR, IN THE ALTERNATIVE, UNDER THE DOCTRINE OF SUBSTANCE OVER FORM**

65. The allegations contained in paragraphs 1 – 64 are restated as if fully set forth herein.

66. On October 5, 2004, Access Bank and Peter Labovitz executed a promissory note for $1,630,000 and corresponding deed of trust (collectively, the "Access Bank Note") to the Residence, 510 Wolfe Street, Alexandria, Virginia. The deed of trust was recorded in the Alexandria land records as Instrument #040042151 on October 15, 2004, and re-recorded as instrument #050002545 on January 27, 2005.

67. Labovitz was unable to make the required payments to Access Bank. Consequently, Labovitz, as president and sole officer of DCIA, directed DCIA to "purchase" the Access Bank Note in 2007 from Access Bank.

68. DCIA purchased the Access Bank Note in October of 2007 from Access Bank, using funds from the sale of the Old Town Holiday Inn.

69. Access Bank assigned the Access Bank Note to DCIA on October 28, 2007.

*The Access Bank Note is Unenforceable*
*under Virginia Code § 8.01-241*

70. The Access Bank Note is no longer enforceable under Virginia law due to the

passage of time.

71. The maturity date of the Access Bank Note was originally September 1, 2006.

72. Pursuant to Virginia Code § 8.01-241, the note was enforceable for 10 years after the maturity date, that is, until September 1, 2016, though the period of enforceability could be extended once by a certificate of extension prior to September 1, 2016.

73. A certificate of extension was filed on February 1, 2012.

74. Under Virginia Code § 8.01-241, this extended the right to enforce the Access Bank Note for ten years from the date of the recordation of the certificate, that is, until February 1, 2022.

75. Thus, the limitations period for enforcing the Access Bank Note expired on February 1, 2022.

*Alternatively, the Access Bank Note is Unenforceable because it is Held by Labovitz's Nominee or is a Façade of a Debt under the Doctrine of Substance Over Form*

76. Upon information and belief, Labovitz has exercised dominion and control over the Access Bank Note after it was "purchased" by DCIA. In particular:

   a. Labovitz has control over the terms of payment. Interest accrued on the Access Bank Note at 4.75% annually, and required monthly payments of interest, with a balloon payment of the remaining interest and principal on the Maturity Date that was September 1, 2016. However, to the extent that Labovitz has made interest payments at all, he has made them only in November or December of each year, rather than monthly; Labovitz did not make a balloon payment of the remaining interest and principal on the Maturity Date of September 1, 2016, and Labovitz has never made any payments towards the principal balance.

13

    b. Similarly, Labovitz has control over whether DCIA will attempt to collect the unpaid amounts on the loan. DCIA has not sought to renegotiate the terms of the Access Bank Note, including the Maturity Date of September 1, 2016; and DCIA has not taken any other steps to collect the unpaid balance on the Access Bank Note.

77. The interest "payments" by Labovitz to DCIA towards the Access Bank Note have been circular in nature. Labovitz does not receive enough income to make full interest payments on the Access Bank Note. The "interest payments" by Labovitz have either been:

(1) a circular movement of funds where DCIA provides dividends to the Trusts, the Trusts distribute the funds to Sharon Labovitz, and Sharon Labovitz or her husband uses that distribution to pay DCIA;

or

(2) reported as made to DCIA but with no funds exchanged between any individuals or entities, given that, according to Labovitz, the entity receiving the interest payments (DCIA) is owned by entities (the Trusts) that distribute income to Sharon Labovitz, so that interest "payments" to DCIA can simply be accounting entries reflecting distributions from the Trusts to Sharon in that amount.

78. DCIA has not attempted to impede Labovitz's full use and enjoyment of the Residence in any way, despite Labovitz's ostensibly increasing debt to DCIA under the Access Bank Note. Labovitz and his wife reside at the residence, receive rents from the Residence, and pay all expenses.

79. Labovitz and his wife Sharon benefit greatly from the Access Bank Note and the alleged "lien" created by the Note. The Access Bank Note ostensibly creates a higher-priority

encumbrance on the Residence which will never be paid down, which does not require payment under its terms, and which will never be foreclosed upon. This insulates Labovitz from bona fide creditors like the United States, by creating a supposed lien that leaves little equity available to bona fide creditors.

80. In addition, Labovitz retains full control and ownership over the entity that supposedly has a lien against his Residence.

81. For all the foregoing reasons, the Court should declare that DCIA is the nominee of Peter Labovitz with respect to the Access Bank Note.

82. Alternatively, since DCIA "purchased" the Access Bank Note, it has not acted as a creditor holding a note would act and the Access Bank Note should be disregarded under the doctrine of substance versus form of debt instruments and/or as a sham transaction.

83. Either under the nominee doctrine or under the doctrine of substance over form or sham transactions, the Access Bank Note is no longer enforceable against the Labovitz Residence.

**COUNT III: DECLARATORY JUDGMENT THAT THE TRUSTS ARE THE NOMINEES OF PETER LABOVITZ WITH RESPECT TO THE NVR NOTE AND THE NVR NOTE IS NO LONGER ENFORCEABLE**

84. The allegations contained in paragraphs 1-83 are restated as if fully set forth herein.

85. On November 9, 1990, NVR Savings Bank FSB and Peter and Sharon Labovitz executed a home equity line of credit for $500,000 and corresponding deed of trust (collectively, the "NVR Note") to the Residence. The NVR Note was recorded in the Alexandria land records as Instrument #040042151 on December 3, 1990, in Deed Book 1314, page 1162.

15

86. Rather than simply paying back the NVR Note in full, Labovitz directed the Trusts to "purchase" the NVR Note from NVR Savings Bank FSB in 1994. NVR Savings Bank FSB assigned the NVR Note to the Trusts on March 10, 1994.

87. When Labovitz directed the Trusts to "purchase" the NVR Note, Labovitz was aware that DCI Publishing, Inc. had multiple unpaid federal employment tax liabilities, and that he could face personal liability on account of those unpaid tax liabilities.

88. Upon information and belief, Labovitz exercised dominion and control over the NVR Note since it was "purchased" by the Trusts. In particular:

   a. Labovitz has had control over the terms of payment. Interest accrued on the NVR Note between 8% (at a minimum) and 14.75% (at a maximum), depending on the "prime rate" published in the "Money Rates" section of the Wall Street Journal. The terms of the credit agreement include minimum monthly payments.

   b. Since the Trusts purchased the NVR Note, Labovitz has either made nominal payments on the NVR Note, or none at all. Upon information and belief, for 18 years - from 1994 to 2012 - Labovitz made no payments of interest or principal to the Trusts on the NVR Note.

   c. After the United States sought to collect the unpaid federal tax liabilities in the case of *United States v. Peter Labovitz*, 1:12-cv-106 (E.D. Va.), the Trusts began reporting that they received the minimal imputed interest for below-market loans. Imputed interest is the amount that, for federal tax purposes, the Trusts are treated as receiving in a year, even though they did not actually collect that amount.

   d. Similarly, Labovitz had control over whether the Trusts will attempt to collect the unpaid amounts on the NVR Note. The Trusts have not sought to renegotiate the

16

terms of the NVR Note, and the Trusts has not taken any other steps to collect the unpaid interest or principal.

89. The Trusts have not attempted to impede Labovitz's full use and enjoyment of the Residence in any way, despite Labovitz's ostensibly increasing debt to the Trusts under the NVR Note. Labovitz and his wife reside at the residence, receive rents from the Residence, and pay all expenses.

90. Labovitz and his wife Sharon benefit greatly from the NVR Note and the "lien" created by the Note. The NVR Note ostensibly creates a higher-priority encumbrance than the United States' liens on the Residence which will never be paid down, which does not require payment under its terms, and which will never be foreclosed upon. This insulates Labovitz from bona fide creditors like the United States, by creating a supposed lien that leaves little equity available to bona fide creditors.

91. Sharon Labovitz, being both beneficiary of the Trusts and one of its trustees, has testified that, as an obligor on the NVR Note, it would not make sense for her to make payments to the Trusts under the Note. Meanwhile, as she testified, it also did not make sense, as trustee of the Trusts, to demand payment from herself or Peter Labovitz toward the NVR Note.

92. For all the foregoing reasons, the Court should declare that the Trusts are the nominees of Labovitz with respect to the NVR Note.

93. Alternatively, since the Trusts "purchased" the NVR Note, they have not acted as a creditor holding such a note would act and the NVR Note should be disregarded under the doctrine of substance versus form of debt instruments and/or as a sham transaction.

94. Under the nominee doctrine or under the doctrine of substance over form or sham transactions, this Note and the lien underlying it are no longer enforceable against the Labovitz Residence.

WHEREFORE, plaintiff, the United States of America, prays that this Court:

A. Adjudge that the United States has valid and subsisting federal tax liens on all property and rights to property of Peter C. Labovitz.

B. Adjudge that the property or rights to property of Peter C. Labovitz include an interest in the property at 510 Wolfe Street, Alexandria, Virginia;

E. Adjudge that the United States has a valid and subsisting judgment lien on the real property at 510 Wolfe Street, Alexandria, Virginia.

F. Adjudge that the liens of the United States against 510 Wolfe Street are prior and superior to any security interest arising from the Access Bank Note, the NVR Note or the Collateral Pool Lien;

G. Adjudge that all liens on the property at 510 Wolfe Street, other than the liens of the United States of America, are void;

H. Award to the United States its costs of prosecuting this action; and

I. Order such further relief as the Court deems just and equitable.

DATE: January 23, 2025  DAVID A. HUBBERT
Deputy Assistant Attorney General

By: */s/ Kieran O. Carter*
KIERAN CARTER (VA Bar No. 81953)
ARI D. KUNOFSKY
RYAN MCMONAGLE
Trial Attorneys, Tax Division
U.S. Department of Justice
Post Office Box 227

Washington, DC 20044
Tel.: (202) 353-5264
Fax: (202) 514-6866
Kieran.O.Carter@usdoj.gov
Ari.D.Kunofsky@usdoj.gov
Ryan.McMonagle@usdoj.gov